1
2
3
4
5
6
7
8
9          IN THE UNITED STATES DISTRICT COURT

10          FOR THE EASTERN DISTRICT OF CALIFORNIA

11
12

13   **TOMMY DAVIDSON,**                      **Case No. 1:14-cv-00745 AWI MJS (HC)**

14                            Petitioner,     **FINDINGS AND RECOMMENDATION**
                                              **REGARDING PETITION FOR WRIT OF**
15        **v.**                              **HABEAS CORPUS**

16
17   **RAYMOND MADDEN, Warden,**

18                            Respondent.

19
20
21          Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas

22   corpus pursuant to 28 U.S.C. § 2254. Respondent, Raymond Madden, acting warden of

23   California State Prison, Centinela, is hereby substituted as the proper named respondent

24   pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. Respondent is

25   represented by Robert C. Nash of the office of the California Attorney General.

26   Respondent declined magistrate judge jurisdiction. (ECF No. 7.)

27
28

                                              1

**I.   Procedural Background**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on March 9, 2010, for first degree murder, felon in possession of a firearm, being an active member of a street gang, participation in a criminal street gang, and numerous enhancements. (Lodged Doc. 1, Clerk's Tr. at 557-60.) On May 18, 2010, Petitioner was sentenced to an indeterminate prison term of life without the possibility of parole, and an additional determinate term of fifteen years. (Id.)

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate District. (Lodged Doc. 2.) On October 31, 2011, the appellate court affirmed the conviction. (Id.) Petitioner sought review by the California Supreme Court on November 21, 2011. (Lodged Doc. 3.) The petition for review was denied on February 15, 2012. (Lodged Doc. 4.)

Petitioner proceeded to file collateral appeals in the forms of petitions for writ of habeas corpus in the state courts. He filed a petition with the Kern County Superior Court. (Lodged Doc. 5.) It was denied in a reasoned decision on April 16, 2013. (Lodged Doc. 6.) Petitioner then filed a petition for writ of habeas corpus with the Fifth District Court of Appeal. It was denied on July 26, 2013. (Lodged Docs. 7-8.) Finally, Petitioner filed a petition for writ of habeas corpus with the California Supreme Court. The petition was denied on January 21, 2014. (Lodged Docs. 9-10.)

Petitioner filed his federal habeas petition on May 19, 2014. (Pet., ECF No. 1.) Petitioner raised the following seven claims for relief: (1) that the failure to grant defense counsel's request to have a witness testify in a closed courtroom due to safety concerns violated Petitioner's Sixth Amendment right to present a defense; (2) that the trial court erred in striking the testimony of a witness that refused to answer questions during cross-examination; (3) that the trial court erred when it allowed the defense expert to testify regarding prejudicial gang evidence; (4) that the trial court erred in denying Petitioner's motion to release information of a juror's identification; (5) that there was

insufficient evidence to prove the gang enhancement and special circumstance; (6) that defense counsel was ineffective for failing to cross-examine several of the prosecution's witnesses; and (7) the trial court violated Petitioner's constitutional rights by failing to instruct the jury on the elements of active participation in a criminal street gang.

Respondent filed an answer to the petition on June 3, 2015. (Answer, ECF No. 25.) Petitioner filed a traverse to the answer on July 25, 2015. (Traverse, ECF No. 29.)

## II.   Statement of Facts[1]

STATEMENT OF THE FACTS

Charnika Lee had known Jesse Hill, the murder victim, for approximately three years. They started out as friends, but their relationship developed into a boyfriend-girlfriend relationship. Lee was familiar with street gangs and knew that Hill was a member of the East Side Crips. Lee knew defendant and knew that Hill felt that defendant was like family to him. Defendant was an "OG," an original gangster and older person in the gang.

Hill began pulling back from the gang in 2008. When Hill was in jail the beginning of 2009, Lee had daily contact with him. Hill told Lee he wanted to change the way he was living and wanted to leave the gang. Sometimes Hill would have a conference call with Lee and with Pastor Wesson discussing his desire to change. In a taped conversation from jail on February 10, 2009, Hill told Lee how he wanted to get out of the gang and really wanted to change. Hill said he was not going to stay "on the 'hood," which meant he was going to leave the gang.

On March 12, 2009, Hill called Lee and said he was going to be released from jail that evening. He asked Lee to pick him up and to call the pastor. Lee picked up Hill and drove him to Hill's Aunt Linda's house. During the drive, Hill used Lee's phone to call the pastor. The pastor could not talk at that time and said he would call back. Hill visited for a few minutes with family, got a change of clothes, and left with Lee.

Lee drove Hill to the market where he cashed a check and bought some liquor. They drove to a home on Powell Lane. When they arrived Hill opened the liquor bottle and poured himself a cup. He put the bottle in the trunk and then he and Lee went inside the house.

There were several men inside the house, including defendant who was on the couch. Hill greeted everyone, but defendant did not reply. Hill asked the others what was the matter with defendant. He was told that someone had shot at defendant two hours earlier, and defendant was upset.

---

[1] The Fifth District Court of Appeal's summary of the facts in its October 31, 2011 opinion is presumed correct.  28 U.S.C. § 2254(e)(1).

Defendant and Hill talked for a short while. Defendant then grabbed a gun that was underneath the couch and stood by Hill and pointed the gun at him. Jabbaar King, the owner of the house, wrestled defendant for the gun and the two fell onto the couch. King retrieved the gun and took it to another room of the house. Lee had seen the gun before, because it had belonged to Hill.

At one point during the 30-minute visit by Hill and Lee to the house on Powell Lane, defendant became angry that people were calling him Tommy, he aggressively told them to call him "T." People were drinking at the house, but were not using drugs. Lee and Hill left after half an hour.

After going to a few other places, including Lee's house where Hill changed his clothes, Lee and Hill saw two males who asked Hill if he wanted to purchase a bottle of vodka. Hill said he did not want to purchase it, but he knew someone who would. One of the males with the vodka, Paul Evans (Blue), accompanied Hill and Lee back to the residence on Powell Lane. They went into the house. The same people were there who had been there earlier, except Demarcus Burns. Burns returned after a few minutes and purchased the bottle of vodka. The group drank from the vodka bottle.

Defendant and Hill began talking. A woman barged in the front door and defendant told her that she could get shot for walking into a house the way she did. She joked and said she had a gun in her purse and knew how to shoot back. This made defendant angry and he said he would kill her. Hill tried to calm defendant; the woman left. Hill explained to Lee that defendant had caught his wife with another man, and he was angry.

Hill and defendant began a serious conversation. Hill told defendant he was going to leave the gang. Defendant said to Hill that he was not going to leave the gang. Hill replied that he was. Defendant said, "[Y]ou used to be my Loc, now you're acting like a square." A "Loc" is a fellow gang member; a square is someone who does not "gang bang."

The two continued their conversation with Hill insisting he was going to leave the gang, and defendant saying he was not going to. Hill then swore he was going to leave the gang, and he swore on A-Loc's grave. (A-Loc was a friend of Hill's who was killed in 2008.) This angered defendant and he said Hill should swear on the life of Nub (Leon Anderson), a Stroller Boy (the subset of the East Side Crips gang), who was killed by a police officer. Hill replied that it did not matter whose life he swore on because he was going to quit the gang.

Defendant was angry and was in Hill's face acting like he wanted to fight. They continued to argue and the argument became heated. Lee tried to stop them from arguing. Defendant rushed at Hill and Hill hit defendant. They began fighting and fell on the couch. Hill was hitting defendant and then got up and backed away. Defendant got up and went after Hill. They continued to argue and Hill complained to defendant that he was disrespecting him. To this defendant replied that he could disrespect Hill because he (defendant) was a "big homie."

Defendant rushed at Hill again and they fought. They fell behind the door and Hill was hitting defendant hard. Hill stopped hitting defendant

and they got up. Defendant said, "[L]et's take it outside." Everyone in the house, except King, went outside and the arguing continued. Lee went to her car, started it, and urged Hill to leave with her. Hill and defendant continued to yell about respect with Hill saying he was being disrespected, and defendant saying he did not have to respect Hill.

Hill calmed down and went to Lee's car. He put his sweater and shirt in the back seat, and had his foot in the car. Defendant walked up and said, "Got to disrespect you, and you're a square, and I'm your big homie." Defendant and Hill returned to the driveway and continued to argue. Nathaniel Jones got in the middle of the two and Hill pushed Jones and told him to get out of his face. Jones returned to Hill and told him to calm down. Hill pushed Jones to the ground. Jones got angry and told Hill he was going to get a gun and kill him.

Hill continued to be angry about everyone disrespecting him. Hill hit Jones and defendant ran into the house, got a gun, and came back outside. As defendant came out of the house, Burns grabbed Hill and broke up the fight. He told Hill to calm down. As defendant got near Hill and Burns, he slid the slide of the semiautomatic pistol to the rear, bringing it forward to load a round into the gun. Defendant was three to five feet away from Hill.

Burns and Hill looked up and were surprised. Hill put his hands up and backed up. In disbelief, Hill said to defendant, "[O]h, it's like that, Tommy, you're gonna shoot me, you're gonna shoot me?" As soon as Hill said this, defendant shot Hill. Hill clutched his stomach and ran to the end of the driveway; defendant followed and fired another shot at Hill. Hill continued to run, with defendant running behind him. Defendant kept firing as he chased Hill down. Lee lost sight of the pair as they ran down the street to the cul-de-sac, and she quickly left the scene. She drove to the home of Hill's Aunt Linda and they returned to the crime scene. Everyone had left the home on Powell Lane and it was dark. Hill was on the ground and a sheriff deputy was there. Lee told officers what happened, she was interviewed later that morning, and still later she gave further details after she had calmed down.[fn1]

**FN1**: Lee was afraid of defendant and was in the witness protection program when she testified at trial. She had previously acquired a gun because of her fear. When she was stopped by law enforcement some time after the murder, she had a gun in her purse. She was not charged with this crime.

A neighbor on Powell Lane woke up after 1:00 a.m. on March 13, 2009, when he heard a big bang. He saw a man on the ground and man standing over him. The neighbor could not hear what was being said, but the man standing over the victim was moving his mouth and pointing. One man ran away, the man on the ground was bleeding and asking for help. The neighbor called 911. During a television interview the neighbor told the reporter that one male was on the ground while the other male held a gun on him before running off. Another neighbor heard four or five gunshots and saw a car drive quickly away from the area.

Officers and medical personnel arrived on the scene. Hill was found in a cul-de-sac area down the street from King's home. Hill was transported to the hospital where he was pronounced dead at 2:01 a.m. At

the scene, Detective Lloyd Waters followed the trail of blood. He found a drinking cup, a bag of marijuana, one live round and one spent shell casing in the yard where the blood trail began. Additional shell casings were found along the trail of blood.

Hill died from a gunshot wound to his torso. The bullet entered on the back right side and traveled to the front left side in a slightly downward angle. He had a blood alcohol level of .218. His blood alcohol reading may have tested higher than usual because the blood tested was taken from his stomach.

Burns testified that he knew defendant and Hill. Hill and Burns were together when they were shot in 2006. Although Burns knew King, Burns stated he had never been to the house on Powell Lane and was not present when Hill was shot. He denied ever being in a gang or knowing anyone who was a gang member.

At trial, Jones said he had seen defendant and Hill before. He denied any gang involvement and denied talking to defendant while defendant was in jail. In an interview before trial, Jones said he was not present, and then eventually admitted he was present when defendant and Hill got into the argument. Hill got upset and struck Jones. Jones walked away and, as he walked, he heard screaming, running, and gunshots.

King testified at trial that he had a barbeque on March 12, 2009, and a lot of people came to his house on Powell Lane. He thought defendant was at his house. Hill was at his house with a woman. King could not remember who else was there that day. He testified there were a lot of people arguing; he told the people to leave and they went outside. King heard gunfire and heard people leaving so he also left. He did not see a firearm in his house. King said he did not know any East Side Crips.

In an interview before trial, King said defendant and Hill were at his house the day Hill was killed. Defendant and Hill got into an argument about who was the "hardest." Although they argued, King said there was no hand-to-hand combat. King said there was no flashing of guns, but he saw defendant with a gun earlier. He described defendant as a bad man with a reputation.

Evans said he was not a member of the East Side Crips, but he hung out with family members who were. He knew Hill. On March 12, 2009, he approached Hill and asked him if he wanted to buy a bottle of vodka. Hill said he knew someone who would. Hill, Lee and Evans drove to the house on Powell Lane. Evans said there were approximately five people there.

Evans said that Hill and defendant began arguing. Hill was complaining that the others had forgotten him while he was in jail and Hill was not going to mess with them anymore. Hill and defendant continued to argue. They talked about A-Loc and defendant cursed A-Loc. Hill and defendant wrestled and Hill pushed defendant down on the couch and started socking him. Defendant smiled at the others as if to indicate that he thought Hill was crazy. Evans thought that it looked like defendant was just "messing" with Hill, but Hill seemed serious. Evans pulled them off each other, but they continued to argue. Evans wanted to leave.

6

Defendant told Hill that he had raised him and taught him.

Evans got Hill to go outside. Defendant went outside and Hill told him he was tired of being treated like a kid. Jones grabbed Hill and told him to calm down. Hill pushed Jones off of him. Defendant asked Hill why he had pushed Jones, and Hill said he was tired of everyone grabbing him. Hill asked the others to leave him alone. Defendant and Hill continued to argue. At some point defendant told Hill he was being disrespectful. Evans was walking away when he heard gunshots and then he ran away.

Defendant was apprehended by law enforcement on April 2, 2009, in Compton, at the home of Donnisha Reneau. Reneau had been friends with defendant for a long time. Defendant called her on March 13, 2009, and asked if he could go and stay with her because he had a disagreement with his girlfriend. He arrived that same date having only the clothes on his back and his cell phone with him. He had to purchase clothes after he arrived.

Antoinette Mitchell, Hill's mother, testified that she had known defendant for a very long time and he was a friend of the family. Hill started hanging out with defendant when Hill was 17 years old. They hung out all the time. Mitchell had knowledge of the East Side Crips and the Stroller Boys. She testified that defendant was originally a member of the Midnight Strollers, a dance group that evolved into the Stroller Boys, a criminal street gang. Defendant was an OG in the Stroller Boys and was well respected in the gang. Leon Anderson was a close friend of defendant's. On the day Anderson was killed, he had gotten into an argument with Hill. There had been problems between Mitchell's family and Anderson's family since that day. Mitchell named several members of the East Side Crips and Stroller Boys.

The mother of two of defendant's children, LaShanda Armstead, testified. Armstead believed that defendant was in a gang. In the past 10 years, defendant had only been employed for three months total. Hill was approximately 20 years younger than defendant, but they were friends. In the days before Hill was killed, Armstead had received a voice message from defendant that he was losing his mind, in another message defendant said he was going to be responsible for someone's death. Defendant also told Armstead she would not come between him and his daughter and asked Armstead to give him their daughter so they could move on. Defendant was upset that Armstead was having a relationship with someone else.

Armstead testified that Hill and Anderson had an earlier dispute because Hill wanted to be a shot caller. According to Armstead, defendant thought Hill was responsible for Anderson's death, he thought Hill had disrespected Anderson, and the day after Anderson was killed, defendant thought he should have someone kill Hill.

Donald Wesson, the pastor of St. Paul Baptist Church, testified that he met Hill as a child in 1995. Hill was changing in the months before he died. Hill wanted to get his life straightened out. Wesson was trying to help Hill leave the gang life.

Greg Jehle, a sergeant with the Bakersfield Police Department,

testified as a gang expert. He testified that the East Side Crips is a criminal street gang with more than 600 members. A primary activity of the gang is narcotic sales, and guns are the tools of their trade. A subset of the East Side Crips is the Stroller Boy Crips. The larger group is broken down into smaller groups to control drug sales in a particular neighborhood.

The Stroller Boys started as Midnight Strollers, a group of street dancers. Defendant is an original member of the Stroller Boys and in 2009 he was a senior member. The gang has engaged in a pattern of criminal behavior, including murders.

Jehle testified that gang members typically do not quit the gang, and it is a risky proposition when they do. One who leaves the gang is considered disloyal. Gang members have to show respect to senior members of the gang. If the proper respect is not shown, there will be punishment, up to being killed. The top members of the gang are called OG's, shot callers, or senior members. It is important for an OG to command respect from younger gang members. It is disrespectful to try and get out of the gang or for a younger gang member to argue with an OG.

Jehle had known defendant for 20 years. Jehle described defendant's tattoos, the times he had been booked into jail when he claimed the East Side Crips and Stroller Boys as his gang, and the numerous times he had been contacted by law enforcement while in the presence of known gang members.

Jehle then identified several instances when defendant engaged in criminal behavior. The first instance was in 1984. Defendant had a personal disagreement with Lonnie Key over defendant's sister's pregnancy. Defendant went to Key's residence and fired two shots at him. Key ran and defendant continued to shoot at him. Defendant fled after the shooting. Jehle said this incident was significant because it showed that a gun is the tool used by gang members to gain respect.

In an incident in 1985, defendant had marijuana in jail. Jehle testified that possessing narcotics in jail gives them status. Defendant was involved in the sale of drugs in 1994. This was relevant because the East Side Crips made money by selling narcotics. In 1994, defendant had a gun under his bed. Defendant violated his parole on more than one occasion by continuing to associate with gang members.

It was Jehle's opinion that defendant was an active member of the East Side Crips Stroller Boys gang and had been an active member since its inception, achieving senior status. It was also Jehle's opinion that Hill was an active member of the East Side Crips Stroller Boys gang. After Anderson was shot, defendant stepped up to be the leader of the gang. Many people in the gang blamed Hill for Anderson's death. Lee was not a gang member.

The district attorney posed a hypothetical question to the gang expert mirroring the facts of the case; the gang expert said that in such a hypothetical situation the actions of defendant would benefit the gang and would be performed with the specific intent to further or assist the gang. An OG could not maintain his position as an OG if he did not take action

when a younger gang member challenged him. If an OG lost to a younger member, he would lose "face." The OG had to finish the fight and win.

DEFENSE

Defendant's cousin, Myja Gardner, testified on defendant's behalf. Her testimony was stricken entirely after she refused to answer certain questions on cross-examination.

Deputy sheriff Tommy Robins testified that he interviewed the neighbor, Phillips, after the shooting. Phillips told him he saw one man on the ground and another man running away. Phillips did not tell Robins that he saw one man holding a gun and standing over the victim. Phillips was nervous and reluctant to talk to Robins.

Defendant testified on his own behalf. He said he had several jobs in the past 10 years including a three-month job at a refinery, a seven-to-eight month job at a group home, a gardening service, and various temporary jobs. In addition to working, he spent a lot of time taking care of his children and his cousin's children.

He was a member of the Midnight Strollers, a dance group, which became the Stroller Boys in the 1980's, and was a member of the Stroller Boys. He had tattoos reflecting his membership. In the mid-1990's his sister was killed in a drive-by shooting and he stopped participating in the gang. He still associates with 20 or 30 members of the East Side Crips because they are his friends.

Defendant said he knew Hill since Hill was a baby and saw him every other day. Hill was a Stroller Boy. On the evening of March 12, 2009, someone shot at defendant. He did not have a gun and did not retaliate in any way. He then went to King's home on Powell Lane.

Hill came to the house with Lee in the evening and stayed for a short time. Hill and defendant did not argue. Hill returned later, with Lee and Evans. Hill wanted to know why defendant had not retaliated after the shooting earlier in the day. They argued about that. Hill swung at defendant while inside the house. Someone broke up the fight, and then Hill hit defendant again. They continued to argue, and argued about A-Loc. King told everyone to go outside. The group at the house went outside while King remained inside.

Hill and defendant argued again and Hill removed his shirt. Jones tried to intervene and Hill hit Jones. Jones got up and walked away. Hill and defendant continued to argue. Defendant asked Hill why he hit Jones. Hill said he was tougher than all the others. Hill walked to the car to get something. Hill returned, and defendant and Hill started fighting. While wrestling, defendant noticed that Hill had a gun in his waistband. Defendant gained control of the gun when it fell to the ground. Defendant jumped up and fired one shot while Hill was some distance from him. Hill ran away and defendant fired some shots into the air. Defendant turned around and went back inside the house. Someone, who defendant could not identify, took the gun. Defendant left.

Defendant testified that he fired the shot because he was in fear for his life. He knew how Hill "was" and knew of assaults Hill had committed

9

on other people in the community. Defendant knew Hill was often armed, and Hill had told him he had shot at someone before. Defendant thought if he did not shoot Hill, Hill would shoot him. Defendant left town because he was scared.

Defendant said he did not have a dispute with Hill about Anderson's death. On the evening of March 12, 2009, Hill was upset that no one put money on his books when he was in jail and no one looked up to him. Hill did not say anything to defendant about wanting to leave the gang.

On cross-examination defendant admitted he had prior convictions, but stated he did not commit any crimes on behalf of the East Side Crips. He obtained his gang tattoos while in prison and stopped being a member of the gang in the mid-1990's. Defendant admitted it was possible that he may have said Hill should be killed after Anderson was killed. Defendant denied telling officers he was on the ground when the gun went off. Defendant said he cocked the gun and defendant was a couple of feet away when he shot him. Defendant testified he did not run to the cul-de-sac after he shot Hill. He only ran as far as the next house.

Defendant was afraid Hill would take the gun from him and kill him.

REBUTTAL

Detective Royce Haislip interviewed defendant on April 7, 2009. Defendant initially denied shooting Hill. Haislip asked defendant 11 times if he shot Hill and defendant said no. Haislip told defendant he knew that defendant shot Hill. Defendant then said that Hill had a gun in his waistband and while they were fighting the gun went off on its own. Defendant later said the gun accidently discharged after defendant picked it up. Still later, defendant said he picked up the gun. Hill was choking him and he feared for his life, so he shot the gun. Defendant said after this the gun continued to fire.

People v. Davidson, 2011 Cal. App. Unpub. LEXIS 8291, 2-21 (2011).

## II.    Discussion

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

1

## B.    Legal Standard of Review

2          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

3   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

4   filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

5   114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

6   the AEDPA; thus, it is governed by its provisions.

7          Under AEDPA, an application for a writ of habeas corpus by a person in custody

8   under a judgment of a state court may be granted only for violations of the Constitution

9   or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n.

10  7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

11  state court proceedings if the state court's adjudication of the claim:

12         (1) resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established federal law, as
13         determined by the Supreme Court of the United States; or

14         (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the State
15         court proceeding.

16  28 U.S.C. § 2254(d).

17              **1.    Contrary to or an Unreasonable Application of Federal Law**

18         A state court decision is "contrary to" federal law if it "applies a rule that

19  contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

20  that are materially indistinguishable from" a Supreme Court case, yet reaches a different

21  result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06.

22  "AEDPA does not require state and federal courts to wait for some nearly identical

23  factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

24  even a general standard may be applied in an unreasonable manner" Panetti v.

25  Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The

26  "clearly established Federal law" requirement "does not demand more than a 'principle'

27  or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state

28  decision to be an unreasonable application of clearly established federal law under §

1   2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

2   (or principles) to the issue before the state court. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-

3   71 (2003).  A state court decision will involve an "unreasonable application of" federal

4   law only if it is "objectively unreasonable." <u>Id.</u> at 75-76, quoting <u>Williams</u>, 529 U.S. at

5   409-10; <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002). In <u>Harrington v. Richter</u>, the

6   Court further stresses that "an *unreasonable* application of federal law is different from

7   an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing <u>Williams</u>, 529

8   U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks

9   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

10  correctness of the state court's decision." <u>Id.</u> at 786 (citing <u>Yarborough v. Alvarado</u>, 541

11  U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

12  have in reading outcomes in case-by-case determinations." <u>Id.</u>; <u>Renico v. Lett</u>, 130 S.

13  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

14  Federal law for a state court to decline to apply a specific legal rule that has not been

15  squarely established by this Court." <u>Knowles v. Mirzayance</u>, 129 S. Ct. 1411, 1419

16  (2009), quoted by <u>Richter</u>, 131 S. Ct. at 786.

17              **2.      Review of State Decisions**

18          "Where there has been one reasoned state judgment rejecting a federal claim,

19  later unexplained orders upholding that judgment or rejecting the claim rest on the same

20  grounds." <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  This is referred to as the

21  "look through" presumption.  <u>Id.</u> at 804; <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1198

22  (9th Cir. 2006). Determining whether a state court's decision resulted from an

23  unreasonable legal or factual conclusion, "does not require that there be an opinion from

24  the state court explaining the state court's reasoning." <u>Richter</u>, 131 S. Ct. at 784-85.

25  "Where a state court's decision is unaccompanied by an explanation, the habeas

26  petitioner's burden still must be met by showing there was no reasonable basis for the

27  state court to deny relief." <u>Id.</u> ("This Court now holds and reconfirms that § 2254(d) does

28  not require a state court to give reasons before its decision can be deemed to have been

1   'adjudicated on the merits.'").

2          Richter instructs that whether the state court decision is reasoned and explained,

3   or merely a summary denial, the approach to evaluating unreasonableness under §

4   2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

5   or theories supported or, as here, could have supported, the state court's decision; then

6   it must ask whether it is possible fairminded jurists could disagree that those arguments

7   or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

8   Thus, "even a strong case for relief does not mean the state court's contrary conclusion

9   was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

10  authority to issue the writ in cases where there is no possibility fairminded jurists could

11  disagree that the state court's decision conflicts with this Court's precedents." Id. To put

12  it yet another way:

> As a condition for obtaining habeas corpus relief from a federal
> court, a state prisoner must show that the state court's ruling on the claim
> being presented in federal court was so lacking in justification that there
> was an error well understood and comprehended in existing law beyond
> any possibility for fairminded disagreement.

16  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

17  are the principal forum for asserting constitutional challenges to state convictions." Id. at

18  787. It follows from this consideration that § 2254(d) "complements the exhaustion

19  requirement and the doctrine of procedural bar to ensure that state proceedings are the

20  central process, not just a preliminary step for later federal habeas proceedings." Id.

21  (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

### 3.    Prejudicial Impact of Constitutional Error

23          The prejudicial impact of any constitutional error is assessed by asking whether

24  the error had "a substantial and injurious effect or influence in determining the jury's

25  verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

26  U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

27  state court recognized the error and reviewed it for harmlessness).  Some constitutional

28  errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v.

Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002).  Musalin v. Lamarque, 555 F.3d at 834.

## III.   Review of Petition

### A.   Claims One and Two: Refusing to Close Court and Striking Witness's Testimony

Petitioner claims that the trial court erred in denying his request to have a defense witness testify in a closed courtroom due to fear for her safety. Petitioner further claims that the court denied him his right to present a defense by striking the witness's testimony after she refused to testify on cross-examination with spectators present.

#### 1.   State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in a subsequent petition for review by the California Supreme Court. Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

1

In denying Petitioner's claim, the California Court of Appeal explained:

2

I.     Refusal to Clear the Courtroom for Testimony by Defense Witness

3

4

5

6

Gardner, defendant's cousin, was called to testify on defendant's behalf. She testified that she was 36 years old, had known defendant all her life, and lived in the same house he lived in, her mother's house. Gardner testified that she knew Hill, and knew that Hill and defendant had been friends for years. Hill was at their home every day, and when Hill was in jail he would call every day. Hill and defendant got along and did not argue.

7

8

9

Gardner testified that she grew up in East Side Crips territory, lived there continuously for more than 20 years, and currently lived there. She testified that she knew more than 20 people who were affiliated with the East Side Crips. Some of them were family members and friends. She claimed to have discussed gang life and gang culture with them.

10

11

12

13

14

She testified that defendant had tattoos and had them for more than 10 years. She said that defendant was not an active gang member. He did not participate in activities that gang members normally participated in, such as robbing, shooting, and selling drugs; he did not possess drugs or guns; he did not participate in gang meetings and did not tell others what to do. She said defendant spent most of his time at home; he spent his time fishing, working around the house, and watching his children and Gardner's children.

15

16

17

18

19

20

21

22

23

24

On cross-examination Gardner was asked about her visits with defendant in the jail; the money she would put on his books; and the fact that she loved him. She denied ever attending an East Side Crips meeting. She said she was at the house when the sheriff came looking for defendant after Hill was killed and denied knowing defendant's whereabouts at the time. She said she spoke with defendant on the telephone during the time period after Hill was killed and before the sheriff arrested him and, again, denied knowing where defendant was. She was asked if she knew defendant's oldest son, Tommy Davidson, Jr. She said she did. She was asked if he was an East Side Crip. She said he was not. When asked where Tommy Davidson, Jr., was, she said he was in jail and agreed he was charged with a gang-related crime. She again said, however, that he was not a gang member. She was asked about Christopher Mills. She denied knowing him. She was asked about Blue Foot. She denied knowing him. It was at that point, she was asked, "Who are some of the people that you know who you believe are Eastside Crips, their names?" She refused to answer the question. The People then said, "Ma'am, you stated you knew lots of people that were." She answered, "I do." The People then said, "Tell us." She refused to answer the question.

25

26

The court gave defense counsel the option of striking Gardner's testimony or holding her in contempt to see if she would testify. Defense counsel stated that Gardner said she would answer the questions and would be ready to proceed at 1:30 p.m. The court then recessed for lunch.

27

28

Upon returning after lunch, defense counsel made a motion to exclude the public during the testimony of Gardner and another defense witness. Counsel asserted that Gardner was reluctant to name East Side

Crips members in front of Hill's family or associates who were seated in the courtroom; she felt her safety would be jeopardized or she would be labeled a snitch. Defendant agreed to waive his right to a public trial for the two witnesses.

The People refused to waive any right to a public trial. The prosecutor argued that defense counsel opened the door regarding who were members of the East Side Crips gang members in an open courtroom, and the People should be allowed to cross-examine the witness in front of the same people. The People also stated that there was no indication that there was a safety issue. They pointed out that there was no evidence anyone in the audience had behaved inappropriately, threatened anyone, or intimidated anyone. In addition, the People noted that these witnesses were not on the witness list, were undesignated witnesses, and the People were deprived of running the names by the jurors. The People also thought it was unfair that one side would be able to clear the courtroom of spectators when the witnesses called by the prosecution were required to testify in front of defendant's friends and family.

The court stated that it had kept a close eye on the civilians in the courtroom and had also instructed law enforcement to keep a close eye on them. The court had not seen anything to indicate that any type of intimidation was occurring. The court thought the People had a good point that if the shoe were on the other foot, it would be difficult to clear the courtroom for the People's witnesses. The court noted that defense counsel had not designated the witnesses on the witness list, and it was unfair to now call the witnesses and additionally ask that the courtroom be cleared for their testimony. The court denied defense counsel's request to clear the courtroom for cross-examination. The court stated, "So if you wish to call somebody who's not on the witness list, that's your choice, and they're going to have to answer the questions in front of the public."

Proceedings resumed with Gardner retaking the witness stand. The People reminded Gardner that she had been asked, before lunch, whether or not she could tell them who the East Side Crips gang members were who she knew, and asked her if she was willing to tell them now. Gardner said, "no." The court excused the jury, held Gardner in contempt, ordered her taken into custody, and appointed an attorney to represent her.

The following morning, the court held a contempt hearing. Gardner's counsel stated that she would be willing to answer the questions with the proviso that the public be removed from the court during her testimony. Her counsel indicated that she had a well-founded fear that answering the questions would result in harm to her. Her fear was based on the fact that her husband was murdered in front of 100 people by a youngster being initiated into a gang and yet not one person would testify about what they saw. Gardner's counsel had asked members of the Hill family to not come into the courtroom during Gardner's testimony, but they refused his request.

Defense counsel stated that Gardner's testimony was important and helpful to the case, and again asked that the public be removed just for the one question. The court questioned defense counsel why he had not brought up the issue before calling Gardner to the stand so the court could have addressed the issue before she testified on direct examination.

Defense counsel replied that he did not anticipate that Gardner would be asked this question, but did say he had discussed with Gardner, before her initial testimony, that he would be asking her "questions about Eastside Crips, about people that she knew, about the gang lifestyle, and this would open the door to certain issues." During his discussion with Gardner, after she first refused to answer the People's question, Gardner agreed to "go ahead and name names." When she took the stand the second time, he believed that she realized "that the public had not been excluded from the courtroom" and so refused to testify.

The People argued that there had not been a proper showing sufficient to exclude the public from hearing testimony in this case. In addition, the People claimed Gardner's refusal to answer a question unfairly limited the People's right to cross-examine her on a very material issue in the case.

Counsel for Gardner argued that everyone knew that one of the things East Side Crips were known for was witness intimidation. He asserted that Gardner's recollection of her pretestimony conversation with defense counsel was different than the recollection of defense counsel. Gardner told him that defense counsel represented to her that she was not going to be asked to name any names. Gardner's counsel emphasized that Gardner had a well-founded fear of retaliation.

The court stated that it was clear from the testimony Gardner did give, that she could testify that defendant was not a gang member because she was familiar with gangs and the gang lifestyle, including who was in the gang and how it worked. The court said that it was apparent Gardner would understand the questions that would be asked of her in court. The court noted the information Gardner had testified to regarding defendant being her relative who had been "locked up" and who she had been out to talk to on many occasions. The court concluded that, Gardner was not a "simpleton who [did not] understand what [was] going on," and that the people who had been present in the courtroom had done absolutely nothing to intimidate anyone. The court concluded there had not been the necessary showing to exclude the public. The court determined that it would strike Gardner's answers given in both direct examination and cross-examination.

Defense counsel asked the court to take a less drastic solution and merely allow the jury to consider the failure to answer the question in evaluating her credibility. The court denied defense counsel's request finding that the question was a very material part of the case and the inability to fully cross-examine Gardner limited the People's cross-examination, which was a necessary part of a jury trial. After defendant testified, the court informed the jury that it was striking all of Gardner's testimony and they were not to consider it.[fn2]

**FN2**: After the court ruled it would not exclude the public from the questioning of Gardner, defense counsel stated it would not be calling a second witness because that witness was also fearful.

Defendant now claims his right to present a defense and his right to compulsory process was violated when the trial court denied the request to clear the courtroom because defense witnesses were fearful of retaliation from the East Side Crips.

Defendant cites to People v. Esquibel (2008) 166 Cal.App.4th 539 (Esquibel) and Waller v. Georgia (1984) 467 U.S. 39 (Waller).

In Esquibel, a lone gunman, the defendant, entered a public park and shot at a group of adults and children in the park. One of the children was grazed by a bullet. As parents chased after the shooter, the shooter shot again, paralyzing one of the adults. It was claimed that the shooting was gang related. (Esquibel, *supra*, 166 Cal.App.4th at p. 546.)

One of the proposed witnesses at trial was a seven-year-old boy. His mother expressed fear of retaliation in the neighborhood and asked for several accommodations when her son testified including that certain persons in the audience who were associated with the defendant and the gang be removed. The prosecutor explained the mother was concerned that the defendant's friends would recognize the child when they saw him in the neighborhood and that would put the child's life in danger. (Esquibel, *supra*, 166 Cal.App.4th at pp. 546-547.) Although there was no evidence that anyone in the courtroom had engaged in intimidation, the trial court agreed that certain accommodations sometimes had to be made for a young witness and that a young child is more subject to intimidation than an adult, particularly, because it is already traumatic for a witness of that age to come into court and testify. The trial court excluded the two males who were in the audience and were friends of the defendant from the courtroom. The defendant appealed claiming this violated his right to a public trial. (Esquibel, *supra*, 166 Cal.App.4th at pp. 548-549.)

The appellate court found that "the partial closure of a trial by the temporary exclusion of select supporters of the accused [did] not create an automatic violation of the constitutional right to a public trial." (Esquibel, *supra*, 166 Cal.App.4th at p. 554.) "[T]he exclusion of the spectators was for a minimal amount of time and appellant's family supporters remained in the courtroom." (Ibid.) As such, there was no constitutional violation of appellant's rights. (Ibid.)

Unlike Esquibel, this defendant has not asserted a constitutional right to a public trial. Unlike Esquibel, this defendant did not ask for partial closure by the exclusion of select supporters, but asked that the courtroom be closed to the public. Unlike Esquibel, defendant's witness was not a child whose fears of gang retaliation were credible. Defendant's witness was an adult who demonstrated to the trial court sophistication regarding the relevant criminal street gang. The trial court concluded, based on the witness's testimony and its own observations of the audience in the courtroom, that the fear the witness claimed was not believable.

Defendant's contention regarding Waller is that the trial court failed to apply Waller's "standard" for closure.

In Waller the Supreme Court identified four issues that must be addressed when considering denial of public access to a criminal proceeding: "(1) there must be 'an overriding interest that is likely to be prejudiced' if the proceeding is left open; (2) 'the closure must be no broader than necessary to protect that interest'; (3) 'the trial court must consider reasonable alternatives to closing the proceeding'; and (4) the trial court must articulate the interest being protected and make specific findings sufficient for a reviewing court to determine whether closure was

proper." (<u>People v. Baldwin</u> (2006) 142 Cal.App.4th 1416, 1421, fn. omitted.)

The trial court did not deny the public access to defendant's criminal proceeding; it denied defendant's request to deny the public access. In doing so, the trial court made a determination that the witness's assertion of fear was not credible.

Defendant argues that the trial court sought to punish defendant because Gardner was not on the pretrial witness list and, in continuing with its "punitive mood," the trial court put Gardner in jail. According to defendant, the trial court then blamed Gardner for not anticipating that she would be called upon to name East Side Crips in open court, and defendant now claims Gardner's failure to be clairvoyant should not outweigh his right to present a defense and to compulsory process. Next, defendant asserts the trial court determined the defense had to make an actual showing that someone had intimidated Gardner in order to close the courtroom, which was wrong, particularly when the prosecution's case was built on a theory of gang intimidation. Defendant claims these concerns should not trump his right to call witnesses and present a defense.

We do not view the trial court's statements as "punishment." Trial courts are allowed to hold a witness in contempt when a witness refuses to testify. This is not punishment, but an attempt to convince a witness to testify as required by law.

The court did not expect Gardner to be clairvoyant, but noted she was extremely familiar with East Side Crips and their practices, including how they treat witnesses in court. The trial court could properly believe that, because Gardner is not a "simpleton," she was well aware of the questions she might be asked and the possible ramifications of her testimony. It simply did not allow her to manipulate the system. The court could properly view Gardner's fears, expressed only during cross-examination, as disingenuous in light of her extensive knowledge of the East Side Crips and her failure to show any apprehension while testifying about the East Side Crips during direct examination by defense counsel. The trial court was in the best position to determine whether Gardner was intimidated or whether her fear was sufficiently well founded to constitute an overriding interest necessitating closure of the courtroom. (See <u>People v. Baldwin</u>, <i>supra</i>, 142 Cal.App.4th at p. 1422.) Its decision was, in essence, a proper determination that defendant did not prove an overriding interest essential to preserve higher values that necessitated closure of the courtroom.

The fact that a witness is uncooperative or refuses to testify does not constitute a deprivation of the rights asserted by a defendant. To hold otherwise would mean built-in constitutional error each time a defense witness refuses to testify unless his or her conditions are met. The court is not a pawn in proceedings to be manipulated by the desires and requests of witnesses, when those desires and requests have no adequate legal basis.

Defendant also makes arguments related to the next three <u>Waller</u> factors. He claims the proposed closure was no broader than necessary to protect his right to present his defense, the trial court failed to consider

19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

reasonable alternatives, and there was ample evidence to support closure. Having found the trial court did not err when it determined the courtroom need not be closed for a portion of Gardner's testimony, the next three criteria from <u>Waller</u> are not relevant. Additionally, we need not determine prejudice, because there was no error.

II.    <u>Striking the Testimony of Gardner</u>

When Gardner refused to answer certain questions on cross-examination, the trial court struck her testimony, in its entirety, and rejected defendant's suggestion that the court merely instruct the jury to consider the failure to answer the question in evaluating her credibility. Defendant claims striking the testimony in its entirety violated his state and federal due process right to a fair trial.

"In deciding whether to strike a defendant's or a defense witness's testimony based on his or her refusal to answer one or more questions, the trial court should examine '"the motive of the witness and the materiality of the answer." [Citation.]' [Citation.] The court should also consider if less severe remedies are available before employing the 'drastic solution' of striking the witness's entire testimony. [Citation.] These include striking part of the testimony or allowing the trier of fact to consider the witness's failure to answer in evaluating his credibility." (<u>People v. Seminoff</u> (2008) 159 Cal.App.4th 518, 525-526.)

"[T]here is solid support, both judicial and scholarly, for the proposition that when one or two questions asked during cross-examination are at stake and those questions relate to a collateral matter such as the nonparty witness's credibility, the trial court need not strike the entirety of that witness's direct testimony." (<u>People v. Sanders</u> (2010) 189 Cal.App.4th 543, 556.)

The prosecution's question to Gardner asking her to name members of the East Side Crips was not a collateral matter. Gardner was not a percipient witness to the killing of Hill or any facts surrounding the activities of that evening. The thrust of her testimony was that she was knowledgeable about defendant's activities and knowledgeable about the East Side Crips. She testified she knew at least 20 members of the gang. Her testimony regarding her knowledge of the gang was used as the basis to support her opinion that defendant was not an active member of the gang when he shot and killed Hill. The two questions posed by the evidence to the jury were the state of mind of defendant when he shot Hill and whether the shooting was gang related. Defendant's gang status at the time of the shooting was highly relevant to this second question, and also relevant to the first question. The prosecution needed to be afforded the opportunity to test Gardner's knowledge of the gang. Because Gardner's knowledge of the gang was highly relevant to her entire testimony, the question she refused to answer was pivotal and not peripheral to the cross-examination.

We need not decide which standard of review applies to the trial court's determination whether to strike all of a witness's testimony because under either an abuse of discretion or an independent review standard, we find the striking of the entire testimony was not erroneous. (See <u>People v. Sanders</u>, *supra*, 189 Cal.App.4th at p. 554, fn. 2.)

1 | People v. Davidson, 2011 Cal. App. Unpub. LEXIS 8291 at 17-37.

2 | **2.    Analysis**

3 | Petitioner contends that the denial of the trial court to allow defense witnesses

4 | Myja Gardner and Deandra Key to testify in a closed courtroom violated his Sixth

5 | Amendment right to present a defense and call witnesses on his behalf. As described

6 | above, Petitioner called Gardner as a defense witness, but on cross-examination, she

7 | expressed fear about answering prosecution questions, and Petitioner's counsel

8 | requested that she be able to testify in a closed courtroom. When the witness was asked

9 | questions by the prosecution regarding her familiarity with the Eastside Crips gang and

10 | its members, she refused to answer out of fear of retaliation.

11 | Respondent argues that the appellate court properly defined the issue as follows:

12 | "The trial court did not deny the public access to defendant's criminal proceeding; it

13 | denied defendant's request to deny the public access." People v. Davidson, 2011 Cal.

14 | App. Unpub. LEXIS 8291 at 21-35.) Respondent is correct. However, the additional

15 | concern, in addition to the right to public access, is whether Petitioner's right to present a

16 | defense witness under the Sixth Amendment was violated. The Court will address each

17 | in turn.

18 | **i.    Public Trial**

19 | First, "[t]he Sixth Amendment provides, in relevant part, that in all criminal

20 | prosecutions, the accused shall enjoy the right to a speedy and public trial." United

21 | States v. Cazares, 788 F.3d 956 (9th Cir. 2015). While not relevant here, the Sixth

22 | Amendment has been broadly construed to extend beyond the actual proof presented at

23 | a trial. Id., citing Waller v. Georgia, 467 U.S. 39, 44-47 (1984) (pretrial suppression

24 | hearing must be open to the public)). Petitioner is not arguing that his right to a public

25 | trial was violated. He is arguing the opposite – that the trial court did not allow his

26 | witness to testify to a closed court out of safety concerns.

27 | Even assuming that his witness had legitimate safety concerns (which the state

28 | court found she did not), the claim fails as there is no clearly established Supreme Court

1    law requiring courts to close the courtroom to allow a defendant to present favorable

2    testimony.   A state court decision is "contrary to" federal law if it "applies a rule that

3    contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

4    that are materially indistinguishable from" a Supreme Court case, yet reaches a different

5    result."  Brown v. Payton, 544 U.S. at 141 (2005).  A state court's decision is not "an

6    unreasonable application" of Supreme Court law if it merely "decline[s] to apply a specific

7    legal rule that has not been squarely established by this Court." Harrington v. Richter,

8    562 U. S. 86, 101 (2011). Petitioner presents no legal authority regarding a defendant's

9    right to request to close a courtroom for the benefit of a defense witness. The Court will

10   address whether the failure to do so denied Petitioner's right to present a defense, but

11   Petitioner's claim that the actions of the state court violated his right to a public trial is not

12   supported by Supreme Court authority, and therefore without merit.

13                      **ii.      Sixth Amendment Right to Present a Defense**

14          Petitioner alternatively argues that the denial to close the courtroom and the

15   striking of the witness's testimony violated Petitioner's right to present a defense under

16   the Sixth Amendment. "Whether rooted directly in the Due Process Clause of the

17   Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the

18   Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful

19   opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319,

20   324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (quoting Crane v. Kentucky, 476 U.S.

21   683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986). Due process is violated only where

22   the excluded evidence had "persuasive assurances of trustworthiness" and was "critical"

23   to the defense. Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d

24   297 (1973); accord Green v. Georgia, 442 U.S. 95, 97, 99 S. Ct. 2150, 60 L. Ed. 2d 738

25   (1979). A trial court retains wide latitude to exclude evidence that is repetitive or only

26   marginally relevant. See Crane, 476 U.S. at 689-90; Holmes, 547 U.S. at 326-27. "Only

27   rarely has [the Supreme Court] held that the right to present a complete defense was

28   violated by the exclusion of defense evidence under a state rule of evidence." Jackson,

                                                        22

133 S. Ct. at 1992. Moreover, even if this Court found a violation of petitioner's constitutional rights, the error would only provide grounds to grant a writ of habeas corpus if it had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.

In the case of apparent witness intimidation, California law provides courts with discretion as to whether to remove members of the public to promote witness safety. See People v. Esquibel, 166 Cal. App. 4th 539, 555 (2008); Cal. Penal Code §§ 686.2, 867, 868, 868.5-8. Relevant to this case, a court can exclude spectators under California Penal Code section 686.2 if they are intimidating a witness. To do so, the Court must hold a hearing and make factual findings that the spectator is engaging in intimidation, which is preventing the witness from giving complete testimony, and removal is the only reasonable means necessary. Id.

The state court found that Defendant has not shown that anyone was intimidating the witness or that the witness was fearful based on any intimidation. The court found that

> Gardner's fears, expressed only during cross-examination, as disingenuous in light of her extensive knowledge of the East Side Crips and her failure to show any apprehension while testifying about the East Side Crips during direct examination by defense counsel. The trial court was in the best position to determine whether Gardner was intimidated or whether her fear was sufficiently well founded to constitute an overriding interest necessitating closure of the courtroom. (See People v. Baldwin, supra, 142 Cal.App.4th at p. 1422.) Its decision was, in essence, a proper determination that defendant did not prove an overriding interest essential to preserve higher values that necessitated closure of the courtroom.

People v. Davidson, 2011 Cal. App. Unpub. LEXIS 8291 at 21-35. Petitioner has not shown that the state court acted unreasonably in failing to exclude spectators. Nor has Petitioner shown that the decision of the state court prevented him from a meaningful opportunity to present a defense. Gardner was presented as a rebuttal witness to the criminal street gang charges. While she testified for the defense that Petitioner was not actively involved in the gang, she refused to answer questions on cross-examination that might have undermined her credibility regarding Petitioner's involvement in the gang. As

1   the state Court of Appeal found, Gardner admitted that she and Petitioner lived in gang

2   territory and that she knew at least 20 people associated with the gang. However, as she

3   would not answer questions regarding the gang members that she knew, it created the

4   inference that Petitioner may have also known many of the individuals in the gang and

5   possibly associated with known gang members.

6        Even assuming that the trial court erred in failing to vacate the courtroom for

7   Gardner's testimony on cross examination, the error was harmless. A constitutional

8   violation only provides grounds to grant a writ of habeas corpus if it had a "substantial

9   and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at

10   637. In this case, there was strong evidence that Petitioner shot the victim. Charnika Lee

11   testified that she saw Petitioner shoot the victim. (Rep. Tr. at 218-219.) As the Court of

12   Appeal noted, a neighbor provided corroborating testimony of seeing a male with a gun

13   standing over the victim, and other witnesses testified that Petitioner and the victim were

14   arguing shortly before the shooting.

15        With regard to Petitioner's gang affiliation, Sargent Greg Jehle testified that he

16   knew Petitioner for 20 years. People v. Davidson, 2011 Cal. App. Unpub. LEXIS 8291 at

17   15-16. Jehle testified to numerous instances since 1984 where Petitioner engaged in

18   criminal activity, where Petitioner told law enforcement that he claimed the East Side

19   Crips and Stroller Boys as his gang, and numerous times Petitioner had been contacted

20   by law enforcement while in the presence of known gang members. Id. It was Jehle's

21   opinion that Petitioner was an active member of the East Side Crips Stroller Boys gang

22   since its inception and had become a leader of the gang. Id.

23        Based on the totality of the evidence presented, Petitioner has not shown that the

24   result of the trial would have been different had the Court cleared the courtroom and

25   allowed Gardner to testify. The California court's rejection of Petitioner's claims to a right

26   to a public trial or to present a defense was not contrary to nor an unreasonable

27   application of federal law. 28 U.S.C. § 2254(d)(1). It is recommended that Petitioner's

28   first and second claims for relief be denied.

**B.     Claim Three – Admission of Propensity Evidence by Expert Witness**

Petitioner next contends the trial court erred in allowing unduly prejudicial propensity evidence during the testimony of Sargent Jehle, the prosecution's gang expert.

### 1.     State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 2-4.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

III.     Prior Conviction of Defendant as Basis for Gang Expert Testimony

Defendant made a motion in limine to exclude the admission of any evidence related to a shooting by defendant that occurred in 1984 and resulted in defendant's conviction for assault with a deadly weapon. He claimed it was inadmissible negative character evidence and unduly prejudicial under Evidence Code section 352.

The People asked the court to conduct a "402 hearing" during which the gang expert would testify as to the significance of the 1984 shooting to his opinion as to whether defendant was a gang member, the period of time he was a gang member, and whether he was a gang member when Hill was shot.

The requested hearing was held. Jehle, the gang expert, testified that, in 1984, defendant had an argument with Lonnie Key concerning defendant's sister and Key seeing someone who was related to a person responsible for the death of defendant's brother. During the argument, defendant confronted Key, Key fled, and defendant fired a gun at Key twice. Defendant then fled, was later arrested, and was convicted, by plea, of assault with a deadly weapon. Jehle testified that, at the time of the 1984 incident, defendant was involved in the Midnight Strollers, a gang. The Midnight Strollers was also the "beginning of" the Stroller Boy Crips. Jehle believed defendant was a member of the East Side Crips at the time. In 1984 the STEP Act (Street Terrorism Enforcement and Prevention Act) was not in effect. Jehle said it did not matter if the members were called the Midnight Strollers or the Stroller Boys, in 1984 they were committing crimes now reflected in Penal Code section 186.22, or "gang crimes." Jehle testified that a dispute involving a gang member almost

always led to the use of a firearm, because a firearm is a tool gang members use to solve disputes. Gang members use guns for intimidation and to bolster their position and reputation. Additionally Jehle testified that, in 1984, when law enforcement was looking for defendant, they obtained information regarding where he was loitering or hiding. That location was in East Side Crips gang territory. Jehle testified that he did not know whether Key was a gang member at the time of the 1984 shooting. He had not read all of Key's reports from "back then."

The People argued the evidence should be admitted because it demonstrated that defendant was a member of a gang, that gang members use guns to resolve disputes, and use of a gun shows their dominance in the gang, promotes both the gang and their position within the gang. Defendant argued that the shooting occurred 26 years earlier and was not a gang-related incident; that the evidence was nothing more than propensity or character evidence being offered to show he was the type of person who would use a firearm and shoot at people. Defendant asserted any relevance the evidence might have had to the gang aspects of the case was far outweighed by the possibility for prejudice because the facts of the 1984 incident were so similar to the facts of the case at issue. The People replied that the 1984 assault was just one in a series of crimes defendant committed, thus it was not remote. The prosecutor argued the evidence was relevant to an expert witness's opinion as to whether defendant was a gang member and how long he had been a gang member. The prosecutor stated the jury could be given a cautionary instruction telling them not to use the evidence as character evidence. Defendant argued the curative instruction might not be followed because the nature of the prior shooting was so similar to the facts of the instant case.

The trial court found the 1984 shooting by defendant was relevant to the expert's opinion regarding defendant's involvement in gang-related activity. The fact that defendant's conviction was 26 years old did not sway the court because defendant continued to lead a life that was other than law abiding. The court found defendant's actions years ago showed he was willing to use a firearm to promote himself and his position within the gang consistent with the expert's testimony that gang members solve disputes with guns. The court found the testimony was standard information used by experts in gang cases and concluded the probative value outweighed any prejudicial effect. The court allowed admission of the evidence.

During trial, Jehle gave extensive testimony regarding the East Side Crips, their primary activities, their subsets, their members, their pattern of criminal behavior, and their structure and mode of operation.

Jehle then focused his testimony on defendant. He had known defendant for about 20 years. Jehle described defendant's tattoos, his bookings into jail, and the times Jehle or other officers had encountered defendant during street checks. The People then asked Jehle about some of the offense reports involving defendant. The first was the 1984 shooting of Key. Jehle testified that defendant had a disagreement with Key and fired a shot at him. Key ran, defendant followed and fired another shot at him. The disagreement was personal and involved Key and defendant's sister, as well as Key being with a girl who had been involved in the death of defendant's brother. Jehle testified this evidence was significant

because, on the issue of what gang members do and how they take care of their business, a gun is the tool they use to enforce or gain respect or to take care of their business.

It was Jehle's opinion that defendant was an active OG of the East Side Stroller Boy Crips having been with them since the inception when the Midnight Strollers dance group formed a gang into the Stroller Boys. In 2009, defendant was the senior active member of the gang.

On cross-examination defense counsel asked Jehle if the 1984 shooting had any specific gang motive. Jehle said it did not. Defense counsel asked Jehle if he was aware whether Key was a gang member. Jehle said he had no knowledge of that. Jehle testified that he gathered his information primarily from reading police reports regarding the incident.

Defendant claims the shooting evidence was not a proper basis for the gang expert's opinion because it was irrelevant and unreliable. Because it was not admissible as support for the gang expert's testimony, then it was improperly admitted as highly prejudicial propensity evidence. He asserts the evidence was not relevant because his actions in a personal dispute in 1984 did nothing to prove he was a gang member at the time of the 2009 murder of Hill. He also claims it was unreliable because Jehle was unable to establish when the Midnight Strollers became the Stroller Boys and when the Stroller Boys began to commit crimes for the benefit of the gang rather than for their own individual benefit. He concludes that Jehle's expert opinion was overbroad and illogical; using a gun to commit an assault in 1984 does not equate with gang membership in 2009.

"Gang evidence, including expert testimony, is relevant and admissible to prove the elements of the substantive gang crime and gang enhancements. [Citation.]" (People v. Williams (2009) 170 Cal.App.4th 587, 609.) The culture and habits of criminal street gangs are proper subject matters for such testimony. (People v. Gardeley (1996) 14 Cal.4th 605, 617.) The information that forms the basis of the expert's opinion testimony must, however, be reliable. (Id. at p. 618.)

We disagree with defendant's contention that the evidence was unreliable because Jehle was unable to establish when the Midnight Strollers became the Stroller Boys and when the Stroller Boys began to commit crimes for the benefit of the gang rather than for their own benefit as individuals. Although he could not pinpoint an exact date, Jehle testified that the Midnight Strollers became the Stroller Boys and defendant was a member of the Midnight Strollers and continued as a member of the Stroller Boys, a subset of the East Side Crips. Jehle further testified that, although the STEP Act had not yet been passed in 1984, the crimes committed then by members of these groups were gang crimes. We fail to see how Jehle's testimony regarding when the Midnight Strollers became the Stroller Boys establishes the information as unreliable hearsay.

Defendant argues the 1984 shooting was not probative on the issue of whether he was a street gang member in 2009. To the contrary, even though the 1984 shooting did not have a gang motive, it demonstrated an aspect of defendant's history that helped prove he had been a gang member for a long time. This is so because defendant was a gang member at the time and he was willing to use a gun—the tool of a gang

member—to resolve a dispute. His use of the gun, even for a crime that was not gang motivated, gave him respect within the gang. The People's claim that defendant held a position of respect in 2009 was bolstered by evidence that he was part of the gang in 1984 and acted in accordance with the expected practices of gang members.

The evidence was relevant and reliable; defendant's argument fails.

People v. Davidson, 2011 Cal. App. Unpub. LEXIS 8291 at 17-45.

### 2.    Legal Standard

Evidence erroneously admitted warrants habeas relief only when it results in the denial of a fundamentally fair trial in violation of the right to due process. See Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009) citing Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." See Estelle at 67-68. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. Id. The court's habeas powers do not allow for the vacatur of a conviction "based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling" on the admissibility of evidence. Id. at 72.

The United States Supreme Court has expressly left open the question of whether the admission of propensity evidence violates due process. See Estelle, 502 U.S. at 75, n.5; Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001). In Estelle, the Supreme Court expressly refused to determine whether the introduction of prior crimes evidence to show propensity to commit a crime would violate the Due Process Clause. Id. ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."); see also Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006) ("Estelle expressly left this issue an 'open question'"). Because the Supreme Court has specifically declined to address whether the introduction of propensity evidence violates due process, Petitioner lacks the clearly established federal law necessary to support his claims. Id.; see also Mejia v. Garcia, 534 F.3d 1036, 1046-

47 (9th Cir. 2008) (relying on <u>Estelle</u> and <u>Alberni</u> and concluding that the introduction of propensity evidence under California Evidence Code § 1108 does not provide a basis for federal habeas relief, even where the propensity evidence relates to an uncharged crime); <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009) (The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.").

Accordingly, the state courts' rejection of Petitioner's claim could not have been "contrary to, or an unreasonable application of, clearly established" United States Supreme Court authority, since no such "clearly established" Supreme Court authority exists. 28 U.S.C. § 2254(d)(1).

Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. <u>Estelle</u>, 502 U.S. at 72; <u>Walters v. Maass</u>, 45 F.3d 1355, 1357 (9th Cir. 1995); <u>Jeffries v. Blodgett</u>, 5 F.3d 1180, 1192 (9th Cir. 1993); <u>Gordon v. Duran</u>, 895 F.2d 610, 613 (9th Cir.1990). Constitutional due process is violated if there are no permissible inferences that may be drawn from the challenged evidence. <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not." <u>Id.</u> at 920. "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." <u>Boyde v. Brown</u>, 404 F.3d 1159, 1172 (9th Cir. 2005).

Here, the California Court of Appeal appropriately found that the evidence was properly admitted to allow the gang expert to determine whether Petitioner was a member of a street gang at the time of the offense. The California Court of Appeal applied a standard identical to the federal standard. On appeal, the court found that "gang evidence, including expert testimony, is relevant and admissible to prove the elements of the substantive gang crime and gang enhancements." <u>Davidson</u>, 2011 Cal. App. Unpub. LEXIS 8291 at 17-45 (citing <u>People v. Williams</u>, 170 Cal.App.4th 587, 609. (2009)). Federal law holds that evidence of gang affiliation is admissible when it is

1   relevant to a material issue in the case. United States v. Easter, 66 F.3d 1018, 1021 (9th

2   Cir. 1995) (citing United States v. Abel, 469 U.S. 45, 49, 105 S. Ct. 465, 83 L. Ed. 2d

3   450 (1984) (finding gang evidence admissible to show bias)). The Court of Appeal

4   concluded that the evidence of the 1984 shooting was relevant and reliable, and "helped

5   prove that [Petitioner] had been a gang member for a long time." Davidson, 2011 Cal.

6   App. Unpub. LEXIS 8291 at 44. The gang evidence was introduced to establish

7   permissible inferences that were essential to the prosecution's theory. See Jammal, 926

8   F.2d at 919. These inferences include that Petitioner was part of a criminal street gang

9   and Petitioner's motive. See Abel, 469 U.S. at 49. The California Court of Appeal

10  decision denying this claim was not contrary to clearly established Supreme Court

11  precedent. Accordingly, Petitioner is not entitled to habeas relief.

12          **C.**    **Claim Four – Request for Juror Identification Information**

13        Petitioner next contends the trial court erred in failing to provide Petitioner juror

14  identification information after his trial based on Petitioner's claims that the victim's

15  relatives were speaking with jurors during trial.

16            **1.**    **State Court Decision**

17        Petitioner presented this claim by way of direct appeal to the California Court of

18  Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

19  appellate court and summarily denied in subsequent petition for review by the California

20  Supreme Court. (See Lodged Docs. 2-4.) Because the California Supreme Court's

21  opinion is summary in nature, this Court "looks through" that decision and presumes it

22  adopted the reasoning of the California Court of Appeal, the last state court to have

23  issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

24        In denying Petitioner's claim, the Fifth District Court of Appeal explained:

25      IV.   Adequacy of Request to Disclose Juror Identifying Information

26          Code of Civil Procedure section 237 provides that any person may
    petition the court for access to sealed juror identifying information. The
27  person asking for the information must establish a prima facie showing of
    good cause. The denial of a petition for release of juror identifying
28  information is reviewed under the deferential abuse of discretion standard.

(People v. Carrasco (2008) 163 Cal.App.4th 978, 990-991.)

Defendant filed a motion for an order disclosing personal identifying information for the jurors and alternate jurors who served on the case. Attached to the motion was a declaration by defense counsel. He stated that it had come to his attention after trial that there may have been some type of communication during the trial between the victim's family and some jurors. Counsel's investigator spoke to family members of defendant to determine what they had observed. Deondra Key, defendant's niece, told the investigator that on two different occasions during the trial she observed Hill's mother and two of his aunts speaking to two Caucasian female jurors during courtroom breaks.

The People filed written opposition to the motion. The People asserted defendant's declaration did not include facts sufficient to establish good cause for release of the information. In particular, it was claimed the declaration by defense counsel was double hearsay and furthermore was vague, lacking sufficient detail to be considered as reliable facts to qualify as good cause. Also, the People argued Deondra Key was not credible. The prosecutor stated Deondra Key had made derogatory comments about the prosecutor's questions and was ejected from the courtroom during the cross-examination of defendant. She was potentially biased, as demonstrated by her courtroom outburst and her failure to provide any details regarding her accusations.

At the hearing on the motion, defense counsel argued that he had shown good cause for the release of juror identifying information. The prosecutor reiterated the points made in her written opposition to the motion. The court questioned defense counsel why he did not have Deondra Key in court, or have a declaration from her, or a declaration from his investigator. Defense counsel responded that he thought his declaration was sufficient, but would try to take steps to correct the deficiencies, if necessary.

The court denied the motion stating there were no details about the events in the declaration, it did not have a declaration from Deondra Key, it did not have a declaration from the investigator, Deondra Key's credibility was questionable, the matter was not brought to the court's attention during the course of the trial, and the request was overbroad. The court found the facts were not sufficient to establish good cause for the release of the jurors' personal information.

Defendant now asserts his motion for the release of juror identification information should have been granted because defense counsel's motion established good cause. As a secondary argument, defendant claims that denying his motion deprived him of the effective assistance of counsel because it made it impossible for counsel to investigate potential juror misconduct.

"'Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information.'" (People v. Carrasco, supra, 163 Cal.App.4th at p. 990.) "'Normally, hearsay is not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct.'" (People v. Avila (2006) 38 Cal.4th 491, 605.)

1
2
3

       The trial court did not abuse its discretion when it denied the motion for the disclosure of juror identifying information. The declaration was double hearsay and vague, the reporting party lacked credibility and failed to bring the matter to the court's attention when it occurred, and the request was overbroad.

4
5
6
7

       Defendant claims the trial court's error in denying the motion deprived him of the effective assistance of counsel because his counsel could not properly investigate potential jury misconduct. Defendant does not claim his counsel was ineffective in the manner in which he brought the motion. Because the trial court did not err in denying the motion, defendant's claim of ineffective assistance of counsel is baseless.

8

People v. Davidson, 2011 Cal. App. Unpub. LEXIS 8291 at 44-49.

9

     **2.**    **Analysis**

10
11

       California law entitles a defendant to a hearing to obtain juror identifying

12

information only if he first presents a petition that establishes good cause for the

13

information. Cal. Civ. Proc. Code § 237; People v. Jefflo, 63 Cal. App. 4th 1314, 1318-

14

23, n.8, 74 Cal. Rptr. 2d 622 (1998). However, a state court does not need to hold a

15

hearing on the issue of juror information if the defendant's petition and declaration in

16

support of his request fail to establish a prima facie showing of good cause for the

17

release of juror information or if there exists "a compelling interest against disclosure."

18

Cal. Civ. Proc. Code § 237(b), (d). "To establish good cause a defendant must set forth

19

a sufficient showing to support a reasonable belief that jury misconduct occurred."

20

People v. Jones, 17 Cal. 4th 279, 317, 70 Cal. Rptr. 2d 793, 949 P.2d 890 (1998).

21

       Even if the state laws set forth above were misapplied Petitioner's claim would fail

22

as he has not shown any clearly established federal law supporting his claim. Several

23

Supreme Court decisions address juror impartiality and misconduct, but the Court is

24

unaware of any clearly established federal right to investigate a claim of juror

25

misconduct. See e.g., Smith v. Phillips, 455 U.S. 209 (1982) and Tanner v. United

26

States, 483 U.S. 107, 127 (1987). The Supreme Court in Smith considered a defendant's

27

due process right to a hearing before the trial court on a claim of juror misconduct. 455

28

U.S. at 218. The Smith court said nothing of a defendant's right to receive juror

information to assist in his investigation of juror misconduct. Tanner is even less helpful

1    to Petitioner, as the Supreme Court in <u>Tanner</u> warned "long-recognized and very

2    substantial concerns support the protection of jury deliberations from intrusive inquiry."

3    483 U.S. at 127. Ultimately, the <u>Tanner</u> court held the state court's refusal to conduct an

4    evidentiary hearing into a juror's alleged use of narcotics did not violate the defendant's

5    right to a fair and impartial jury where other safeguards, such as voir dire and

6    observations of fellow jurors, sufficiently protected his rights. <u>Id.</u> More recently, the Ninth

7    Circuit found no constitutional violation based on a state court's denial of an evidentiary

8    hearing on a claim of juror misconduct where there was no allegation the jurors

9    considered impermissible extrinsic evidence. <u>Grotemeyer v. Hickman</u>, 393 F.3d 871, 881

10   (9th Cir. 2004).

11       In the absence of clearly established federal law on the issue of a defendant's

12   right to access juror information, Petitioner cannot show that the state court's denial of

13   his claim was contrary to, or an unreasonable application of, clearly established federal

14   law. <u>Carey v. Musladin</u>, 549 U.S. 70, 77 (2006) (in the absence of a Supreme Court

15   holding regarding the prejudicial effect of spectators' courtroom conduct, the state court's

16   decision could not have been contrary to or an unreasonable application of clearly

17   established federal law); <u>see also</u> <u>Brewer v. Hall</u>, 378 F.3d 952, 955 (9th Cir. 2004).

18       Finally, even if the Court could construe Petitioner's claim as presenting a

19   cognizable issue, the trial court reasonably rejected Petitioner's request for the release

20   of juror information, as he failed to make a prima facie showing of good cause for the

21   release of the information. Petitioner failed to make a proper showing of juror

22   misconduct, and did not present the witnesses or a declaration from the witness that

23   supposedly saw the victim's relatives talking to jurors. The state court's denial of

24   Petitioner's claim was not "contrary to" or an "unreasonable application" of "clearly

25   established federal law." 28 U.S.C. § 2254(d). Accordingly, habeas relief is not

26   warranted on claim four.

27       **D.    Claim Five – Insufficiency of the Evidence**

28       Petitioner next contends that there was insufficient evidence that Petitioner's

1  motive for committing the offense was to further the activities of the Eastside Crip gang.

2  ## 1.    State Court Decision

3  Petitioner presented this claim by way of direct appeal to the California Court of

4  Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

5  appellate court and summarily denied in subsequent petition for review by the California

6  Supreme Court. (See Lodged Docs. 2-4.) Because the California Supreme Court's

7  opinion is summary in nature, this Court "looks through" that decision and presumes it

8  adopted the reasoning of the California Court of Appeal, the last state court to have

9  issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

10  In denying Petitioner's claim, the Fifth District Court of Appeal explained:

11  V. Sufficient Evidence of Gang Enhancement and Special Circumstance

12  The jury found true the criminal street gang enhancement for count
one, murder, and count two, felon in possession of a firearm. In addition,
13  the jury found the criminal street gang special circumstance to be true.

14  The sentence enhancements charged under Penal Code section
186.22, subdivision (b)(1), required proof that the underlying felony was
15  "committed for the benefit of, at the direction of, or in association with any
criminal street gang, with the specific intent to promote, further, or assist in
16  any criminal conduct by gang members ...." To prove the special
circumstance alleged under Penal Code section 190.2, subdivision (a)(22)
17  it must be shown "[t]he defendant intentionally killed the victim while the
defendant was an active participant in a criminal street gang, as defined in
18  subdivision (f) of Section 186.22, and the murder was carried out to further
the activities of the criminal street gang."
19

20  Defendant claims the evidence is insufficient to support the gang
enhancement and special circumstance. Defendant contends the
21  evidence was insufficient to find his motive was to benefit or further the
activities of the East Side Crips because what occurred was a personal
22  quarrel between Hill and defendant that escalated to the use of a gun. It is
asserted by defendant that Jehle's opinions regarding defendant's gang
23  motive were simply speculation based on general statements about gang
culture. Defendant argues the only evidence that his actions were to
24  benefit the street gang came from Jehle's opinion.

25  "In considering a challenge to the sufficiency of the evidence to
support an enhancement [or special circumstance], we review the entire
26  record in the light most favorable to the judgment to determine whether it
contains substantial evidence—that is, evidence that is reasonable,
27  credible, and of solid value—from which a reasonable trier of fact could
find the defendant guilty [find the allegations true] beyond a reasonable
doubt. [Citation.] We presume every fact in support of the judgment the
28  trier of fact could have reasonably deduced from the evidence. [Citation.] If

the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (People v. Albillar (2010) 51 Cal.4th 47, 59-60.)

Defendant relies on People v. Ramon (2009) 175 Cal.App.4th 843, a case from this court, to support his argument that expert speculation about motive to benefit the gang, standing alone, is not substantial evidence that will sustain a true finding on the gang enhancement. In Ramon defendant was driving a stolen truck and there was a gun under the driver's seat. The truck was stopped by officers in the heart of gang territory and defendant and his passenger were both gang members. (Id. at pp. 846-848.) We found the evidence was insufficient to support the gang enhancements that the jury found true. "The section 186.22(b)(1) enhancement requires the jury to find that the crime was committed for the benefit of a criminal street gang and with the specific intent to promote the criminal street gang. The only evidence on this issue was provided by the People's expert witness, Lopez.... In summary, Lopez relied on two independent facts in forming his opinion: (1) Both Ramon and codefendant Martinez were members of the Colonia Bakers criminal street gang, and (2) the two were stopped in territory claimed by the Colonia Bakers. From these two facts, along with the crimes the two were accused of committing, Lopez opined that the crime was committed for the benefit of the Colonia Bakers criminal street gang and was intended to promote the Colonia Bakers. Lopez's opinion was based on his belief that because the gun and the stolen vehicle could be used to facilitate the commission of a crime, and the Colonia Bakers commit crimes, the two must have been acting on behalf of the Colonia Bakers." (Id. at p. 849.) We concluded that expert testimony about a possible reason for committing a crime was not sufficient, by itself, to establish the crime was committed with the specific intent to promote, further, or assist in criminal conduct by gang members. (Id. at p. 853.)

The facts in this case to prove the gang enhancement and special circumstance are extensive and are not comparable to the lack of factual support in the Ramon case. The argument between defendant and Hill was precipitated by Hill's expressed desire, as testified to by Lee, that he wanted to leave the gang. Hill and defendant exchanged words over this with defendant stating, "[Y]ou used to be my Loc, now you're acting like a square." As previously set forth, a "Loc" is a fellow gang member; a square is someone who does not "gang bang." As the two continued to argue and Hill complained to defendant that he was disrespecting him, defendant replied that he could disrespect Hill because he (defendant) is a "big homie." When the two were outside defendant walked up to Hill and said, "Got to disrespect you, and you're a square, and I'm your big homie." The facts were overwhelmingly that the dispute between Hill and defendant was gang related, involving Hill wanting to leave the gang, and the question of whom in the gang should be respecting who. The possession of the gun and the killing of Hill were clearly for the benefit of the criminal street gang. Jehle's opinion that the crimes were gang related was supported by ample evidence presented at trial and was not based on speculation.

People v. Davidson, 2011 Cal. App. Unpub. LEXIS 8291 at 47-53.

1

## 2. Legal Standard

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 132 S.Ct. 2, *4, 181 L. Ed. 2d 311 (2011).

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, 132 S.Ct. 2060, 2064 (2012) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant relief, the federal habeas court must find that the decision of the state court rejecting an insufficiency of the evidence claim reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13. Thus, when a federal habeas court assesses a sufficiency

1   of the evidence challenge to a state court conviction under AEDPA, "there is a double

2   dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957, 964

3   (9th Cir. 2011). The federal habeas court determines sufficiency of the evidence in

4   reference to the substantive elements of the criminal offense as defined by state law.

5   Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

6        Petitioner's claim is whether there was sufficient evidence to satisfy the elements

7   of the criminal street gang enhancement under California law. To establish a gang

8   enhancement, the prosecution must prove two elements: (1) that the crime was

9   "committed for the benefit of, at the direction of, or in association with any criminal street

10  gang," and (2) that the defendant had "the specific intent to promote, further, or assist in

11  any criminal conduct by gang members ...." Cal. Penal Code § 186.22(b)(1).) "Not every

12  crime committed by gang members is related to a gang." People v. Albillar, 51 Cal.4th

13  47, 60, 119 Cal. Rptr. 3d 415, 244 P.3d 1062 (2005). Even "when two or more gang

14  members commit a crime together, they may be on a frolic and detour unrelated to the

15  gang." Emery v. Clark, 643 F.3d 1210, 1214 (9th Cir. 2011) (citing Albillar, 244 P.3d at

16  1072.)

17       The specific intent element of § 186.22(b)(1) does not "require[ ] that the

18  defendant act with the specific intent to promote, further, or assist a gang; the statute

19  requires only the specific intent to promote, further, or assist criminal conduct by gang

20  members." Albillar, 51 Cal.4th at 67. This element "applies to any criminal conduct,

21  without a further requirement that the conduct be apart from the criminal conduct

22  underlying the offense of conviction sought to be enhanced." Id. at 66; see Emery v.

23  Clark, 643 F.3d at 1215 (recognizing that Albillar "definitively interpreted § 186.22(b)(1),"

24  "overruled" the Ninth Circuit's interpretation of the statute, and that federal courts are

25  bound by the California Supreme Court's interpretation).

26       Evidence that a crime would enhance a gang's status or reputation or that it would

27  intimidate rival gangs or potential witnesses within the gang's territory, has been found to

28  be sufficient to support a finding that the crime was "for the benefit of" the gang. See,

1  e.g., People v. Garcia, 153 Cal.App.4th 1499, 1503-06, 64 Cal. Rptr. 3d 104 (2007).

2  **3.   Analysis**

3  As described by the California Court of Appeal in its decision, there was

4  significant evidence that the dispute between Petitioner and the victim was caused by

5  the victim's stated intent to leave the gang and his showing disrespect for Petitioner. The

6  Court of Appeal determined that, "The facts were overwhelming that the dispute between

7  Hill and defendant was gang related, involving Hill wanting to leave the gang, and the

8  question of whom in the gang should be respecting who. The possession of the gun and

9  the killing of Hill were clearly for the benefit of the criminal street gang. Jehle's opinion

10  that the crimes were gang related was supported by ample evidence presented at trial

11  and was not based on speculation." (Lod. Doc. 2 at 31.)

12  Review of the records confirms that there was significant evidence that Petitioner

13  was a senior member of the gang and that the dispute was based on the victim's

14  attempts to leave the gang. However, Petitioner does not challenge whether the gang

15  qualified as a criminal street gang, or whether he was an active member of the gang. His

16  sole argument was that the dispute and murder of the victim was a personal dispute, and

17  was not motivated by any desire to further the benefit of the gang.

18  Jehle testified Petitioner was the senior active member of the gang at the time of

19  the offense. (Lod. Doc. 14, Rep. Tr. at 1422-1423.) Jehle opined that a murder such as

20  the one here would further the activities of the gang. (Id. at 1485.) Jehle explained that

21  when a senior member of a gang, such as Petitioner, was disrespected by a more junior

22  member of the gang, it was incumbent on him to act, so as to not lose his status in the

23  gang structure. (Id. at 1486.) By keeping the hierarchical structure of the gang intact,

24  Jehle testified that it helped maintain the success of the gang organization. (Id. at 1487.)

25  While Petitioner does not challenge whether there was sufficient evidence to

26  support finding the existence of a criminal street gang, Jehle presented significant

27  testimony to that effect. Jehle testified that the Eastside Crips has over 600 members.

28  (Rep. Tr. at 1324.) The Eastside Crips has multiple subsets including the Stroller Boy

Crips. (Id. at 1337-1338.) Petitioner was one of the original members of Stroller Boy Crips which formed in the late seventies or early eighties. (Id. at 1345-47.) Jehle personally knew Petitioner for about 20 years, and also knew members of Petitioner's family. (Id. at 1383-84.) Jehle also knew the victim and opined that he was an active member of the Eastside Stroller Boy Crips. (Rep. Tr. 1423, 1435.)

There was yet even more evidence of Petitioner's gang status and evidence that the crimes were committed for the benefit of a criminal street gang. Lee testified that while the victim was in custody, she spoke to him a couple of times per day and would visit him. (Rep. Tr. at 99.) In their conversations, the victim expressed a desire to change his life and leave the gang. (Id. at 101.) She knew it was not going to be easy for him to get out of the gang. (Id. at 101.)

Regarding the events on the evening of the shooting, Lee testified that she accompanied the victim to see Petitioner, and the victim confronted Petitioner and told him that he was going to leave the gang. (Rep. Tr. at 138, 147, 182, 185, 195.) Petitioner told the victim he was not leaving the gang. (Id. at 195.) A heated argument ensued between Petitioner and the victim, and they began to physically fight. (Id. at 201-02.) The victim demanded Petitioner respect him, but Petitioner said he had the right disrespect the victim because he was the victim's "big homie." (Id. at 204.)

Petitioner rushed Mr. Hill again, and again Mr. Hill landed on top of Petitioner hitting him. (Rep. Tr. at 205.) The two men continued to argue about "respect." (Id. at 210.) The fight culminated when Petitioner ran in the house and came back with a gun and shot the victim. (Id. at 214-218.)

Providing the state court with the appropriate level of deference, there was sufficient evidence to support a finding that the murder was committed for the benefit of the criminal street gang. The dispute arose because of the victim's status in the gang, and more specifically based on his desire to leave the gang. In order to ensure the structure and hierarchy of the gang, Petitioner committed the act to show dominance and intimidation and to illustrate to others that it was not acceptable to disrespect a senior

1    member of the gang or attempt to leave the gang. The fact that the evidence was

2    presented as expert opinion does not diminish its sufficiency under California law.

3    California courts have specifically found sufficient evidence based on gang expert

4    opinion. "[T]o prove the elements of the criminal street gang enhancement, the

5    prosecution may ... present expert testimony on criminal street gangs." People v.

6    Hernandez, 33 Cal.4th 1040, 1047-48, 16 Cal. Rptr. 3d 880, 94 P.3d 1080 (2004).

7         Under Jackson and AEDPA, the state decision is entitled to double deference on

8    habeas review. Based on review of the trial record, there was sufficient evidence based

9    on the testimony of witnesses and the gang expert to deny Petitioner's challenge to

10   whether the crime was committed in furtherance of the criminal street gang. There was

11   no constitutional error, and Petitioner is not entitled to relief with regard to this claim.

12        **E.      Claim Six – Ineffective Assistance of Counsel**

13        Petitioner next contends the trial court was ineffective for failing to investigate and

14   present favorable evidence. Specifically, Petitioner argues that counsel failed to cross-

15   examine witnesses presented by the prosecution.

16        **1.      State Court Decision**

17        Petitioner presented this claim by way of a petition for writ of habeas corpus to the

18   Kern County Superior Court. (Lodged Doc. 5.) The claim was denied in a reasoned

19   decision. (Lodged Doc. 6.) Petitioner proceeded to present petitions for writs of habeas

20   corpus to the appellate court and California Supreme Court. (Lodged Docs. 7-10.)

21   Because the higher court's opinions are summary in nature, this Court "looks through"

22   those decisions and presumes it adopted the reasoning of the Kern County Superior

23   Court, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-

24   05.

25        In denying Petitioner's claim, the Kern County Superior Court explained:

26            To prevail on a claim of ineffective assistance of counsel, petitioner
     must show that counsel's performance fell below an objective professional
27   level causing prejudice, which in its absence, would create a probability of
     a different outcome. Strickland v. Washington (1984) 466 U.S. 668, 694.
28   The court may reverse a conviction and order a new trial where it found no

1

evidence supporting the trial court's denial of a new trial, and where there is manifest ineffective assistance of counsel. People v. Taylor (1984) 162 Cal.App.3d 720, 724.

2

3

Defense counsel vigorously cross-examined the prosecution witnesses. If there was any failure to cross-examine a witness, it was done as a tactical choice based upon the comprehensive direct examination by the prosecution. For example, there is nothing to impeach the credentials of Sgt. Jehle given his experience in police work both within the military and civilian realms and his experience in gang and narcotics arrests.

4

5

6

Petitioner also fails in his argument that he acted in self-defense. Although petitioner and Hill initially fought two times, petitioner retreated inside the house before ultimately obtaining a weapon. He came outside and ultimately shot Hill mortally wounding him. Although petitioner testified that he acted in self-defense, the jury found his testimony lacked credibility. Petitioner cannot demonstrate ineffective assistance of counsel on the grounds he alleges.

7

8

9

10

(Lod. Doc. 6 at 3.)

11

**2.    Legal Standard**

12

The law governing ineffective assistance of counsel claims is clearly established

13

for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).

14

Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas

15

corpus alleging ineffective assistance of counsel, the Court must consider two factors.

16

Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry

17

v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's

18

performance was deficient, requiring a showing that counsel made errors so serious that

19

he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

20

Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell

21

below an objective standard of reasonableness, and must identify counsel's alleged acts

22

or omissions that were not the result of reasonable professional judgment considering

23

the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

24

(9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court

25

indulges a strong presumption that counsel's conduct falls within the wide range of

26

reasonable professional assistance. Strickland, 466 U.S. at 687; see also, Harrington v.

27

Richter, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

28

Second, the petitioner must demonstrate that "there is a reasonable probability

that, but for counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were "so serious as to deprive defendant of a fair trial, a trial whose result is reliable." Id. at 687. The Court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1348; United States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697. Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance. Id. at 692; United States v. Cronic, 466 U.S., at 659, and n. 25 (1984).

As the Supreme Court reaffirmed in Harrington v. Richter, meeting the standard for ineffective assistance of counsel in federal habeas is extremely difficult:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Williams, supra, at 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Ibid. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

<u>Knowles v. Mirzayance</u>, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251, 261 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 131 S. Ct. at 785-86.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> at 786. "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." <u>Id.</u> "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 786-87.

Accordingly, even if Petitioner presents a strong case of ineffective assistance of counsel, this Court may only grant relief if no fairminded jurist could agree on the correctness of the state court decision.

### 3.    Analysis

Petitioner contends that counsel was ineffective by failing to investigate and present favorable witnesses, and for failing to cross-examine several of the prosecution's witnesses.

The reasoning of the state court did not provide great detail, however, it noted that the failure to cross-examine witnesses was a tactical choice in light of the comprehensive direct examination of the prosecution. (Lodged Doc. 6.) Petitioner describes several witnesses that defense counsel did not cross-examine, including the following:

      a.     Lloyd Watters, a detective with the Sherriff's Office, who responded to the scene. (Pet. at 13.)

      b.     Jeff Slaton, an evidence technician that extracted information off cell phones. (Pet. at 13.)

      c.     Officer Joseph Arms, who responded to the scene.

      d.     Officer Ryan Miller, who collected evidence at the scene. (Pet. at 13-14.)

1      e.      Deputy Sheriff Alex Miller.

2      f.       Forensic technician Ivette Ruvalcaba.

3      g.      DNA specialist Kaci Keeney.

4      h.      Sergeant Sean Pratt.

5          Respondent counters that many other prosecution witness were cross-examined

6    by Petitioner's counsel, and that counsel presented Petitioner and four other witnesses

7    in Petitioner's defense. Based on counsel's active role in Petitioner's defense

8    Respondent argues that counsel did not abdicate his role in defending Petitioner, but

9    that the state court was reasonable to find that counsel chose not to cross-examine

10   some of the witnesses based on strategy.

11         The Court has reviewed the testimony of the witnesses in question. Detective

12   Lloyd Watters testified that he arrived at the scene and observed a trail of blood leading

13   away from the house and several .45 caliber spent shell casings. (Rep. Tr. at 758-81.)

14   While the evidence presented by Watters was damaging to Petitioner's defense,

15   Petitioner has not presented any argument as to what, if any, questions on cross-

16   examination would have impeached or otherwise weakened Watter's testimony.

17         Jeff Slaton testified that he has worked as an evidence technician for over 23

18   years. (Rep. Tr. at 827-36.) Slaton obtained the phone longs and phone number contact

19   lists from several cell phones. (Id.) Petitioner has not presented any argument as to how

20   cross-examination of Slaton would have elicited any evidence favorable  to his defense.

21   Upon review of Slaton's testimony, there is no reason to believe that there was any basis

22   to challenge the method in which he obtained data from the cell phones. The state

23   court's determination that not cross-examining Slaton as a matter of strategy was

24   reasonable.

25         Officer Joseph Arms testified that he arrived at the scene, talked to several

26   witnesses, and then assisted in the search of the area which revealed several .45 caliber

27   shell casings that were taken into evidence. (Rep. Tr. at 892-97.) Officer Ryan Miller

28   testified that he assisted in the search, and was the one who collected the casings and

1   put them in a sealed, labeled evidence bag. (Rep. Tr. at 897-902.) Petitioner has

2   presented no basis for challenging Arms or Miller's testimony, both of which were brief

3   and not particularly critical in light of eyewitness testimony of Lee who observed

4   Petitioner shoot the victim. Defense counsel's decision not to cross-examine Arms or

5   Miller was reasonable.

6       Petitioner's claims that defense counsel should have cross-examined the other

7   listed witnesses fare no better. Los Angeles Sherriff Deputy Alex Miller testified

8   regarding Petitioner's apprehension after he fled to Los Angeles. (Rep. Tr. at 862-879.)

9   Despite Petitioner's contentions, defense counsel did cross-examine Miller, and

10  confirmed that Petitioner cooperated and voluntarily exited the house without incident

11  when ordered by law enforcement officers. (Id. at 877-79.)  Forensic technician Ivette

12  Ruvalcaba testified that she assisted in the DNA testing of rounds from the crime scene,

13  but did not offer an opinion as to the results of the testing. (Id. at 904-14.) DNA specialist

14  Kaci Keeney testified that they were unable to find any DNA from the rounds found at

15  the crime scene. (Id. at 914-922.) Finally, sergeant Sean Pratt testified that he assisted

16  in retrieving phone log and other data from the victim and Charnika Lee. (Rep. Tr. at

17  952-67.) A review of his testimony reveals little significant evidence implicating

18  Petitioner.

19      Even assuming that Petitioner could show that counsel failed to act reasonably

20  based on his failure to cross-examine several of the prosecution's witnesses, Petitioner

21  has made no showing that he was prejudiced by counsel's conduct, and that but for

22  counsel's ineffective representation, that the result of trial would be different.  There was

23  significant evidence, as witnessed by several individuals that he and the victim were

24  verbally and physically fighting prior to the shooting. All of the above witnesses

25  presented testimony regarding physical evidence that aided in linking Petitioner to the

26  murder. However, in reality, there appears to be little question, in light of both the

27  physical evidence presented, and the eye-witness testimony that Petitioner was the only

28  likely person to have shot the victim. Defense counsel was aware of this fact, and as

1   explained by the Court of Appeal, focused on a self-defense theory for the shooting,

2   based on the victim's assaults on Petitioner earlier that evening.

3          As there was no basis to challenge the actions of law enforcement in conducting

4   its investigation, Petitioner has not shown that he was prejudiced by counsel's conduct.

5   Counsel was not ineffective for failing to cross-examine each of the named witnesses in

6   light of his self-defense strategy, and regardless, Petitioner has not shown that he was

7   prejudiced by counsel's action.

8          The arguments or theories supporting the state court's decision rejecting

9   Petitioner's claim of ineffective assistance of counsel are not "so lacking in justification

10  that there was an error well understood and comprehended in existing law beyond any

11  possibility for fairminded disagreement." Richter, 131 S. Ct. at 786-87. Petitioner is not

12  entitled to federal habeas relief on this claim.

13              **F.      Claim Seven – Failure to Properly Instruct Jury**

14         Petitioner, in his final claim, contends the trial court violated his Sixth and

15  Fourteenth Amendment rights by failing to properly instruct the jury on the factual

16  elements of active participation in a criminal street gang. Respondent contends that the

17  claim is procedurally barred. Petitioner presented the claim in his petition for writ of

18  habeas corpus filed before California Supreme Court. (Lodged Doc. 9.)

19         In its decision, the California Supreme Court denied the petition based on a state

20  procedural bar. The court addressed Petitioner's claims as follows:

21         The petition for writ of habeas corpus is denied. (See People v. Duvall
           (1995) 9 Cal.4th 464, 474; In re Dixon (1953) 41 Cal.2d 756, 759; In re
22         Swain (1949) 34 Cal.2d 300, 304; In re Lindley (1947) 29 Cal.2d 709,
           723.)
23
    (Lodged Doc. 10.)
24
           Based on the cases cited by the California Supreme Court, it appears that the
25
    California Supreme Court found the claims procedurally barred for failure to raise the
26
    claims on direct appeal.
27

28

### 1.   Legal Framework for Procedural Default

The Supreme Court described the legal requirements that prevent review of claims that were rejected on state court grounds as follows:

> "A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " Kindler, 558 U.S., at 55, 130 S.Ct., at 615 (quoting Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. See Sykes, 433 U.S., at 81-82, 90, 97 S.Ct. 2497.
>
> To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed." Kindler, 558 U.S., at 60, 130 S.Ct., at 618 (internal quotation marks omitted). FN4 [omitted] "[A] discretionary state procedural rule," we held in Kindler, "can serve as an adequate ground to bar federal habeas review." Ibid. A "rule can be 'firmly established' and 'regularly followed,'" Kindler observed, "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Ibid. California's time rule, although discretionary, meets the "firmly established" criterion, as Kindler comprehended that requirement.

Walker v. Martin, 562 U.S. 307, 131 S. Ct. 1120, 1127-1128, 179 L. Ed. 2d 62 (2011) (abrogating Townsend v. Knowles, 562 F.3d 1200 (9th Cir. 2009)).

### 2.   Failure to Raise Claims on Direct Review

Claim seven is potentially procedurally barred by the California Supreme Court's decision to deny state habeas review because the claim was not raised on direct review.

Here, the California Supreme Court applied the Dixon rule to deny the claims in the petition. Dixon states that:

> [t]he general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claims errors could have been, but were not, raised upon a timely appeal from the judgment of conviction.

41 Cal. 2d at 759. Thus, pursuant to Dixon, a California court will not review the merits of a claim in a state habeas proceeding if it could have been raised in a timely appeal but was not.

### 3.   Is the Dixon Rule Adequate and Independent Bar?

The Court must determine whether the Dixon rule is an adequate and

1    independent state rule to serve as a procedural bar. The Supreme Court explained that
2    "a discretionary rule can serve as an adequate ground to bar federal habeas review,"
3    and that a rule may be adequate "even if the appropriate exercise of discretion may
4    permit consideration of a federal claim in some cases but not others." Beard v. Kindler,
5    130 S. Ct. 612, 618 (2009); see also Martin, 131 S. Ct. at 1128-29. As the Supreme
6    Court recently observed in Martin, 131 S. Ct. at 1130, "[d]iscretion enables a court to
7    home in on case-specific considerations and to avoid the harsh results that sometimes
8    attend consistent application of an unyielding rule."

9        The Supreme Court has held that the Dixon rule "qualifies as adequate to bar
10   federal habeas review." Johnson v. Lee, 136 S. Ct. 1802, 1806, 195 L. Ed. 2d 92 (2016).
11   Accordingly, the Court finds that the California Supreme Court expressly invoked an
12   independent and adequate procedural rule in California, commonly referred to as the
13   Dixon rule, and Petitioner has procedurally defaulted this claim.

14                    **4.    Reasons to Overcome Procedural Default**

15       Even when a federal claim has been procedurally defaulted, "[t]he bar to federal
16   review may be lifted, if 'the prisoner can demonstrate cause for the [procedural] default
17   [in state court] and actual prejudice as a result of the alleged violation of federal law.' "
18   Maples v. Thomas, 132 S.Ct. 912, 922, 181 L. Ed. 2d 807 (2012) (quoting Coleman, 501
19   U.S. at 750, 746-47); see also Schneider v. McDaniel, 674 F.3d 1144, 1153 (9th Cir.
20   2012). Adequate "cause" for a default must be an "external" factor that cannot fairly be
21   attributed to the petitioner. Coleman, 501 US. at 753.

22                              **a.    Cause**

23       In Coleman, the court noted that attorney error which rises to the level of
24   ineffective assistance of counsel is considered "cause" within the meaning of this rule.
25   Coleman, 501 U.S. at 753-54. This is because a defendant has a right to effective
26   assistance of counsel under the Sixth Amendment, and a violation of that must be seen
27   as an external factor, and thus the error must be imputed to the state. Id.; Murray, 477
28   U.S. at 488. Petitioner has not alleged any cause for his procedural default.

1

### b.    Prejudice

In addition to cause, prejudice is a required element for Petitioner to overcome a procedural bar. In order to establish prejudice to overcome a procedural default, Petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." See United States v. Frady, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982) (discussing prejudice where defendant failed to object to jury instructions in proceeding under 28 U.S.C. § 2255); Schneider v. McDaniel, 674 F.3d 1144, 1153 (9th Cir. 2012). "Prejudice [to excuse a procedural default] is actual harm resulting from the alleged error." Vickers v. Stewart, 144 F.3d 613, 617 (9th Cir. 1998).

Petitioner cannot establish prejudice with regard to the failure to present his claim that the court erred in failing to instruct the jury regarding the charge of active participation in a criminal street gang. The California Supreme Court has explained that the gravamen of a violation of Penal Code section 186.22(a) "is active participation in a street gang." People v. Albillar, 51 Cal. 4th 47, 55, 119 Cal. Rptr. 3d 415, 244 P.3d 1062 (2010). The elements of the offense are: (1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. People v. Lamas, 42 Cal. 4th 516, 523, 67 Cal. Rptr. 3d 179, 169 P.3d 102 (2007). "All three elements can be satisfied without proof" that the promoted crime was gang-related. Albillar, 51 Cal. 4th at 56. The state supreme court's "authoritative interpretation of section 186.22" must be applied by this Court. Emery v. Clark, 643 F.3d 1210, 1215-16 (9th Cir. 2011) ("Emery II").

The interpretation of this statute on habeas review in the Ninth Circuit was in flux. In Emery v. Clark, 604 F.3d 1102 (9th Cir. 2010) ("Emery I"), the Ninth Circuit certified a series of questions to the state supreme court regarding the specific intent requirement

1  under another provision of section 186.22. The California Supreme Court decision in

2  Albillar addressed the elements of the substantive gang participation offense (section

3  186.22(a)) and a gang activity enhancement (section 186.22(b)(1)). The Albillar Court

4  expressly noted that its decision conflicted with various Ninth Circuit panels.

5      The Albillar decision did not answer the specific questions listed in Emery I.

6  Nevertheless, the Emery II Court acknowledged that the state court definitively resolved

7  the elements and mental intent necessary to commit the substantive offense of active

8  street gang participation.

9      Here, the jury was correctly instructed on the elements of the charge. In

10  accordance with CALCRIM 1400, the jury was instructed that, in order to convict

11  Petitioner of participating in a criminal street gang in violation of California Penal Code §

12  186.22(a), it had to find that: (1) petitioner actively participated in a criminal street gang;

13  (2) when petitioner participated in the gang, he knew that members of the gang engage

14  in or have engaged in a pattern of criminal gang activity; and (3) petitioner willfully

15  assisted, furthered, or promoted felonious criminal conduct by members of the gang. . .

16  by directly and actively committing a felony offense. . . or aiding and abetting a felony

17  offense. (Lodged Doc. 11, Clerk's Tr. at 480-481.)

18      The Court finds that Petitioner would not be successful in his claim of failure to

19  instruct the jury on the active gang participation. As the claim would not be successful,

20  Petitioner is unable to show prejudice based on failure to properly instruct the jury.

21  Accordingly, Petitioner is procedurally barred from presenting his seventh claim, and

22  therefore it recommended that it be denied.

23  **IV.    Recommendation**

24      Accordingly, it is hereby recommended that the petition for a writ of habeas

25  corpus be DENIED with prejudice.

26      This Findings and Recommendation is submitted to the assigned District Judge,

27  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after

28  being served with the Findings and Recommendation, any party may file written

objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   February 27, 2017          /s/ Michael J. Seng

UNITED STATES MAGISTRATE JUDGE